UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

LIONEL ALLEN,

                 Plaintiff,

           -v-

CITY OF NEW YORK,

                 Defendant.

------------------------------------------------------------- X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: January 27, 2016

13-cv-203 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

       Plaintiff Lionel Allen brings this action against the City of New York, alleging race- and nationality-based discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL").[1] (ECF No. 23.) All of plaintiff's claims are premised on the core assertion that the New York Department of Environmental Protection's ("DEP") failure to promote him constituted unlawful discrimination. According to plaintiff, after he made an allegation of racial discrimination at a meeting in 2007, defendant then retaliated against him with unfulfilled promises of promotion. He further alleges that DEP discriminated and retaliated against him by referring him to the Department of

---

[1]       The Third Amended Complaint also asserts claims in violation of 42 U.S.C. § 1981. On September 30, 2014, the Hon. Kenneth Karas, to whom this case was originally assigned, dismissed these claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 39.) Judge Karas also evaluated plaintiff's claims vis-à-vis the statute of limitations and ruled that plaintiff's Title VII claims prior to May 14, 2008 and NYSHRL claims prior to May 14, 2006 are time-barred. (<u>Id.</u>)

      In addition, plaintiff has abandoned his claims based on the issue of worker's compensation and his termination from DEP. (Pl.'s Opp'n Summ. J. Br. ("Pl.'s Br.") at 13; Def.'s Reply Summ. J. Br. at 1, n.1.)

Investigations ("DOI") for submitting a false jury service time slip, which led to subsequent criminal charges.  Before this Court is defendant's motion for summary judgment as to all claims.

The record provided to this Court clearly demonstrates the absence of any triable issue.  Plaintiff has proffered neither evidence that he was qualified for the positions for which he applied nor evidence giving rise to an inference of discrimination, necessary to support his failure to promote claim.  His claim that the DOI investigation was motivated by discriminatory animus fails both because the referrals for investigation and prosecution do not constitute adverse employment actions as a matter of law, and the record lacks any evidence supporting an inference of racially-based motivation.  Furthermore, plaintiff does not proffer any evidence rebutting defendant's nondiscriminatory reason that it was following protocol in responding to evidence of employee misconduct.

Finally, plaintiff's retaliation claims similarly fail.  As to the first, the record is bereft of any evidence that the 2007 meeting and the DOI investigation were causally connected; and again, plaintiff presented zero evidence rebutting defendant's non-retaliatory reasons.  His second retaliation claim relating to a false promise to promote (also allegedly occurring during the 2007 meeting) fails because it does not constitute an adverse employment action.

Accordingly, as further described below, defendant's motion for summary judgment is GRANTED in its entirety and this matter shall be terminated.

I.    BACKGROUND

A.    Relevant Facts

Plaintiff self-identifies as black and Jamaican.  (Def.'s Rule 56.1 Statement
("Def.'s 56.1") ¶ 3.)  He began working for the DEP in 1989 as a Plant Operator at
the Bureau of Water Supply at a water treatment plant known as "Shaft 18" in
Valhalla, New York.  (Def.'s 56.1 ¶¶ 8-9.)  His title was later changed to Watershed
Maintainer.  (Def.'s 56.1 ¶ 10.)  As a watershed maintainer, plaintiff's job
responsibilities included chlorinating water, testing water purity, and maintaining
the facility.  (Pl.'s Resp. to Def.'s 56.1 ¶ 14.)  While employed as a watershed
maintainer, plaintiff obtained a civil engineering scholarship.  (Third Am. Compl.
("TAC") ¶ 20.)  Despite attending three community colleges in pursuit of a degree in
civil engineering, however, plaintiff has not obtained a college degree or professional
license.  (Def.'s 56.1 ¶¶ 11-12; Allen Dep. (Downs Decl., ECF No. 68, Ex. C) Tr.
13:24-14:2.)

1.    Plaintiff's promotion applications

At the heart of this action is plaintiff's allegation that over the past twenty-
five years, his white coworkers were repeatedly promoted while he was not.
Plaintiff asserts that he had positive performance ratings, longer tenure, and that
his value was recognized by the fact that he was often tasked with training new
employees.  (TAC ¶¶ 18-19; Pl.'s 56.1 Counterstatement ("Pl.'s 56.1") ¶¶ 14-16.)
Plaintiff alleges that while he repeatedly applied for promotions, he was denied
them because of his race and national origin.  (TAC ¶ 18.)  He further alleges that
since he began working for DEP, he was the only black or Jamaican employee for

3

the entire duration of his employment, as defendant hired no other black or

Jamaican individuals to work in Shaft 18.  (TAC ¶¶ 13-14.)

Plaintiff alleges that he applied for and was rejected for the following twelve

positions:[2]

- two separate Associate Project Manager positions in June and December 2006;

- two separate Supervisor of Watershed Maintenance positions in January and June 2007;

- a Project Manager position in June 2007;

- a Supervisor of Watershed Maintenance position in April 2008;

- a Supervisor of Watershed Maintenance /Assistant Chief Operator position in June 2008;

- a Civil Engineer position in December 2008;

- an Associate Project Manager/Supervisor of Program Compliance position in December 2008;

- an Associate Project Manager position and an Associate Project Manager/Assistant to the RMP Manager position in February and March 2009, respectively; and

- a Dam Safety Inspector position in February 2009.[3]

(Def.'s 56.1 ¶¶ 103, 108, 114, 118, 122, 125, 128, 133, 136, 139, 143,147; Compl. ¶¶

17, 28.)

---

[2]    Because all of the applications listed here occurred after May 14, 2006, they are not time-barred as NYSHRL claims.  Six of these applications (those occurring before May 14, 2008) are, however, time barred under Title VII.

[3]    Plaintiff applied for a dam engineer position, although he alleges that he believed the job he applied for was a dam safety inspector position.  (Pl.'s 56.1 ¶ 29.)

4

Defendant, on the other hand, claims that plaintiff only applied for two positions:[4]  a 2006 Assistant Project Manager ("APM") position and a 2007 Supervisor Watershed Maintainers ("SWM") position.[5]  (Def.'s 56.1 ¶¶ 111, 121.) There is, however, some corroborating evidence for plaintiff's claim as to at least five positions.  First, plaintiff's supervisor Ralph Marchitelli testified in his deposition that he wrote letters of recommendation for plaintiff for two APM positions and reviewed an application from plaintiff for two more positions (one APM / compliance position and one "supervisor [of watershed management] level one" position).  (Marchitelli Dep. (Rose Aff., ECF Nos. 72, 76, Ex. 5) Tr. 83:10-86:16; 43:16-18.)  In addition, DEP employee Frank Barquet testified that he interviewed plaintiff for a Dam Safety Engineer position in February 2009.  (Def's 56.1 ¶ 149; Allen Dep. Tr. 57:11-13; Barquet Dep. (Rose Aff. Ex. 9) Tr. 25:10-14.)

Apart from plaintiff's list, the record provides scant support for the majority of plaintiff's applications.  For example, plaintiff could not recall who interviewed him, what the qualification requirements were, and who was eventually hired for any of the positions.  (Def.'s 56.1 ¶¶ 103-150.)  However, the positions plaintiff lists

---

[4]     The only evidence defendant provides for this claim is the declaration of Grace Pigott, DEP's Director of Planning and Recruitment, who testified that her review of records show that plaintiff only applied to two positions.  (Pigott Aff. ¶¶ 7-8.)  Plaintiff objects to the affidavit because Pigott was not identified as a Rule 26 witness.  (Pl.'s 56.1 Resp. ¶ 111.)  Defendant has provided insufficient justification for its failure to identify Pigott in their Rule 26 disclosures.  (Def's Nov. 12, 2015 Ltr., ECF No. 88.)  While under these circumstances the Court would not consider substantive statements by Pigott, there is no reason to eliminate her role simply as a custodian of records.  In that regard only, the Court allows the declaration in.

[5]     The parties also dispute whether plaintiff withdrew from consideration after an initial application.  (Def's 56.1 ¶ 187; Marchitelli Dep. Tr. 44:8-45:4; Pl.'s Resp. to Def.'s 56.1 ¶¶ 121, 187.)

in his Complaint generally correspond to the position names and dates listed on

DEP job postings.[6]

### 2.   Plaintiff's qualifications

A comparison of the required qualifications with plaintiff's actual

qualifications eliminates any triable issue as to whether plaintiff was qualified for a

number of positions.  Plaintiff has a high school diploma and coursework towards

an associate's degree from community colleges.  (Allen Dep. Tr. 13:24-16:17;

Marchitelli Dep. (Downs Decl. Ex. P) Tr. 42:4-12 (describing the position's four-year

degree requirement).)  He does not hold an engineer's license.  (Def.'s 56.1 ¶ 12.)

Since joining DEP, plaintiff has worked as a watershed maintainer and has not had

supervisory or project management experience.  (Def.'s 56.1 ¶¶ 9-10; Marchitelli

Dep. (Downs Decl. Ex. P) Tr. 43:16-24.)

Based on his experience and education, plaintiff was not qualified for the

following positions:

- Supervisor of Watershed Maintenance positions, which required, at a

  minimum,[7] a high school degree or equivalent and three years of

  experience in the "operation, maintenance repair, construction or

  inspection of facilities, equipment and lands in a watershed area . . . at

---

[6]      The Court notes that while most of the exhibits to the Pigott declaration correspond to the positions listed in plaintiff's Complaint, there are thirteen position posting exhibits, while there are twelve positions listed.

[7]      One of the SWM positions was for "Level II," which required an additional year of supervisory experience.  (Pigott Decl. Ex. 2.)

least one year of which must have been in a supervisory capacity."
(Pigott Decl. Exs. 1, 3, 4, 5.)  Plaintiff lacks supervisory experience.

- Associate Project Manager positions, which required, at a minimum, one year of full time supervisory experience and either 1) a B.A. degree, 2) a high school diploma plus five years of experience in "project management work," or 3) a high school diploma and any combination of college (bachelor's degree) courses and experience in project management work for five years.  (Pigott Decl. Exs. 2, 6, 7, 8, 9, 10, 13.)[8]  Plaintiff lacks supervisory experience, project management experience, and a degree or coursework towards a Bachelor's degree.

- A "Project Manager, Regulatory Review & Engineering" position, which had the same requirements as a basic Associate Project Manager position, minus the one-year supervisory experience.  (Pigott Decl. Ex. 11.)  Plaintiff lacks project management experience and a degree or coursework towards a Bachelor's degree.

- A Civil Engineer position, which required a New York Professional Engineer's License and four years' experience in civil engineering. (Pigott Decl. Ex. 12.)  Plaintiff lacks both requirements.

In addition, plaintiff concedes that he had been informed he was not qualified for the Assistant Dam Safety Engineer position because he did not have an engineering license.  (Compl. ¶ 28.)

---

[8]     Some of the APM positions were for "Level II," which required an additional year of project management experience, (Pigott Decl. Exs. 6, 10, 13), or a Master's Degree, (Pigott Decl. Ex. 9).

DEP further alleges that for the two positions for which it has records of plaintiff's application, the employees hired were more qualified than plaintiff. (Def.'s 56.1 ¶¶ 112, 121.)  According to DEP, the person hired for the 2006 APM position had a Master of Science degree in Computer Engineering and a Bachelor's degree in electrical engineering.  (Def.'s 56.1 ¶ 112.)  DEP also alleges that the person hired for the 2007 SWM position was more qualified than plaintiff because he had an associate's degree, specialized training in several areas, and had served as an Acting Supervisor.  (Id. ¶ 121.)

### 3.   The December 2007 meeting

In or around December 2007,[9] plaintiff, along with his union representative, David Catala, met with plaintiff's supervisors Mark Donecker, Ralph Marchitelli, and Daniel Massi to discuss plaintiff's applications for a promotion.  (Def.'s 56.1 ¶ 151; Pl.'s 56.1 ¶ 17.)  During that meeting, Catala stated that plaintiff had been repeatedly denied promotions because of his race.  (Def.'s 56.1 ¶ 154.)

The parties dispute several details about the remainder of the meeting.  For instance, defendant claims that the participants had discussed plaintiff's 2007 SWM application, and plaintiff had admitted he could not meet the job's required schedule.  After this, Catala withdrew the discrimination complaint.  (Def.'s 56.1 ¶¶ 153, 155, 161.)  Plaintiff contests this.  (Pl.'s 56.1 Resp. ¶¶ 155, 157.)  The parties also dispute whether Donecker promised plaintiff a promotion at the meeting, or merely consideration for a promotion.  (Def.'s 56.1 ¶¶ 151, 160; Pl.'s Resp. to Def.'s

---

[9]   Although plaintiff does not dispute that the meeting occurred in December 2007, he had previously stated the meeting occurred in September 2007.  (Def.'s 56.1 ¶ 151; Downs Decl. Ex. Q; TAC ¶ 23.)

56.1 ¶ 160.)  Resolution of these disputes, however, is unnecessary to disposition of this motion.

Following this meeting, in 2009, plaintiff interviewed for a Dam Safety Engineer position.  That job required an engineering degree or license, which plaintiff did not possess.  (Def.'s 56.1 ¶¶ 170-71.)

### 4.   The DOI investigation

The DOI investigation issue arose against the backdrop of plaintiff's grievances regarding rejected promotion applications.  In May 2008, plaintiff was called for and attended jury service in Connecticut.  After returning to work, plaintiff submitted his paperwork for days missed for jury service to his direct supervisor Stephen Compito.  (Def.'s 56.1 ¶¶ 19-20.)  Compito noticed a discrepancy—that May 30 was not listed in the court clerk's certification, but was included in the range of dates in plaintiff's leave form—and spoke to plaintiff, giving him an opportunity to correct the dates.[10]  (Def.'s 56.1 ¶¶ 20-21; Downs Decl. Ex. F.)  Plaintiff declined.  Compito did not sign the leave form and instead forwarded it to a supervisor.  (Def.'s 56.1 ¶¶ 21-22.)

On June 12, 2008, Daniel Massi, supervisor of both plaintiff and Compito, reported the matter to DOI,[11] noting that there was another discrepancy:  plaintiff requested paid jury leave for six days, while a report from the court clerk's office

---

[10]    It is undisputed that the leave form also had a clerical error, listing "June 30" instead of "May 30."  (Pl.'s 56.1 ¶ 43.)

[11]    The parties also dispute who from DEP reported the issue to DOI and the nature of the allegations that were communicated to DOI.  (Pl.'s 56.1 ¶¶ 23-25.)  However, defendant has submitted documentary evidence that Massi sent an email to DOI regarding plaintiff's jury slip discrepancy.  (Downs Dec. Ex. H.)

indicated that he only served two days.[12]  (Def's 56.1 ¶¶ 23-24.)  While plaintiff does not dispute that the discrepancy existed, he alleges that this referral to DOI was in retaliation for his 2007 complaint of racial discrimination.  (Pl.'s 56.1 Resp. ¶¶ 18, 28-29.)

DOI investigated the matter and concluded that plaintiff submitted falsified documents to get paid for days on which he did not attend jury service.  (Def's 56.1 ¶ 38.)  DOI referred plaintiff's case to the Westchester County District Attorney's Office ("DA") on November 6, 2008.  (Id. ¶ 40.)

On April 2, 2009, DOI notified DEP that the DA had accepted the case for prosecution.  (Id. ¶ 40.)  On April 9, 2009, plaintiff was arrested.  (Id. ¶ 42.)  Plaintiff was initially charged with two counts of offering a false instrument for filing in the first degree.  (Id. ¶ 47).  The charges were later reduced to a violation for disorderly conduct, to which plaintiff pled guilty on May 6, 2010.  (Id. ¶¶ 48-49.)  As a result of these charges, plaintiff was denied pay for the days he claimed to have been on jury duty, and was suspended for 40 days.  (Id. ¶ 54.)

5.   Transfer

On April 13, 2009, four days after plaintiff was arrested, DEP transferred plaintiff from Shaft 18 to another plant, the Kensico facility.  While plaintiff still held the title of watershed maintainer, at Kensico he worked in the Field Maintenance Section (at Shaft 18 he worked in Operations).  (Pl.'s 56.1 ¶¶ 56-57.)  Plaintiff alleges his responsibilities shifted from more technical tasks such as water

---

[12]      Plaintiff states that the leave request slip he submitted also included a "floating holiday."  (Pl.'s 56.1 Resp. ¶¶ 20-21.)

chlorination to more physical tasks such as maintaining the fields and dams around
the reservoirs, removing trees, and fixing roads and fences.  (Pl.'s Resp. to Def.'s
56.1 ¶¶ 14-15.)  DEP alleges that it transferred plaintiff—after the DOI
investigation was completed and after the DA had ultimately decided to press felony
charges and to arrest plaintiff—because DEP routinely transfers employees whose
responsibilities include maintaining and signing documents relating to the
regulation of the water treatment plant if the employee's integrity has come into
dispute.  (Def.'s 56.1 ¶ 60.)[13]

### 6.   Medical leave

On February 3, 2010, plaintiff injured himself at work and subsequently
submitted a worker's compensation claim.  (Def.'s 56.1 ¶ 65.)  While plaintiff was
away from work after the injury, DEP terminated him on the basis that his absence
was due to a non-work related disability.  (Id. ¶¶ 71-76.)  Plaintiff filed a lawsuit in
state court alleging that his termination was unlawful; he prevailed and the court
ordered DEP to reinstate plaintiff with full benefits from the date of his
termination.  Plaintiff was reinstated in January 2015.  (Id. ¶¶ 80-83.)

While plaintiff originally alleged in this action that his termination and
DEP's refusal to pay him worker's compensation was in retaliation for filing his
discrimination complaint, he has since withdrawn these claims.  (Pl.'s Br. at 13.)[14]

---

[13]      Plaintiff's only allegation that the transfer was retaliatory was in his response to defendant's
Rule 56.1 Statement.  (See Pl.'s 56.1 Resp. ¶ 57.)  He does not make such a claim in his Complaint.
(See TAC.)

[14]      While plaintiff states that he is not proceeding on a discrimination claim based on worker's
compensation, the Court understands him to intend to withdraw the retaliation claim as well, since
in his brief plaintiff does not mention the issue in the discussion of his retaliation claims.

B.    Procedural History

On or around March 16, 2009, after DOI had referred plaintiff to the
Westchester DA's office, but before he was arrested, plaintiff filed a Charge of
Discrimination with the United States Equal Employment Opportunity Commission
("EEOC"), alleging that he was not promoted because of his race, color, and national
origin.  (Def.'s 56.1 ¶ 4.)  On April 28, 2009, EEOC issued a Notice of Charge of
Discrimination to DEP.  (Def.'s 56.1 ¶ 6.)  The EEOC issued a right-to-sue letter to
plaintiff on October 26, 2012.  (See Pl.'s Original Compl. at 1-13.)  While plaintiff
originally alleged that defendant retaliated against him for filing the EEOC
complaint, he has since withdrawn those claims.[15]

On January 8, 2013, plaintiff commenced this action pro se.  (ECF No. 2.)  He
then filed two amended complaints, on January 28, 2013 and on May 31, 2013, also
pro se.  (ECF Nos. 4, 17.)  Plaintiff then retained counsel and filed a Third Amended
Complaint on August 16, 2013.  (ECF No. 23.)  Defendant moved to dismiss on
January 10, 2014.  (ECF No. 29.)  On September 30, 2014, Judge Karas granted the

---

[15]    Plaintiff conceded that "EEOC charge[] was not served on defendant until after the adverse
employment action took place" and did not oppose defendant's summary judgment motion on this
issue.  (Pl.'s Br. at 15-16.)  While it is unclear if plaintiff has formally abandoned his retaliation
claims regarding the EEOC charge, in any event, the undisputed facts show he cannot sustain such a
cause of action for retaliation.  See Greene v. Brentwood Union Free Sch. Distr., 576 Fed. App'x. 39,
42 (2d Cir. 2014) (holding that the complaint about discrimination must precede the adverse action);
Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (requiring that a plaintiff show that the employer
knew of the protected activity and a causal link between the protected activity and adverse
employment action).  Thus, plaintiff cannot sustain retaliation claims for events that occurred before
he filed his EEOC charge—including the DOI investigation, failure to promote, and statements by
his supervisors Joe Vignona and Frank Barquet.  (Compl. ¶ 35-36.)  Furthermore, plaintiff has
proffered no evidence supporting the alleged threat from Vignona.  Testimony from Barquet
indicates that he did not intend to threaten plaintiff.  (Barquet Dep. Tr. 59:7-22.)  In any event,
"stray comments . . . do not create an inference of discrimination."  Dixon v. Int'l Fed'n of
Accountants, 416 F. App'x 107, 110 (2d Cir. 2011) (holding that a single derogatory comment, even if
made by a decision-maker, does not give rise to an inference of discrimination).

motion with respect to the § 1981 claims only.  In addition, Judge Karas ruled that Title VII claims arising on or after May 14, 2008 and NYSHRL claims arising on or after to May 14, 2006 were time-barred.  (ECF No. 39.)  Following this decision, the only remaining claims were the Title VII failure-to-promote claims arising from six promotion rejections from June 2008 to February 2009, NYSHRL claims for failure-to-promote arising from twelve rejections from June 2006 to February 2009, and the retaliation claims.  On March 6, 2015, the case was reassigned to the undersigned.

II.   LEGAL STANDARD

A.   <u>Summary Judgment</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  <u>Id.</u> at 322-23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely

on mere speculation or conjecture as to the true nature of the facts to overcome a

motion for summary judgment," as "[m]ere conclusory allegations or denials cannot

by themselves create a genuine issue of material fact where none would otherwise

exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations

omitted).  The purposes of summary judgment "apply no less to discrimination cases

than to ... other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d

456, 466 (2d Cir. 2001).

    B.    Title VII and the NYSHRL

    Title VII prohibits employment discrimination "against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's race, color, sex, or national origin."  42 U.S.C. § 2000e-2(a).  It

also prohibits retaliation by discriminating "against any . . . employee[] or

applicant[] for employment . . . because he has opposed any practice made an

unlawful employment practice [under Title VII], or because he has made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under [Title VII]."  42 U.S.C. § 2000e-3.

    NYSHRL's antidiscrimination and anti-retaliation requirements rely on the

standards of proof required by Title VII.  See Hicks, 593 F.3d at 164.  Accordingly,

the Court addresses plaintiff's Title VII and NYSHRL claims together.

        1.    Employment discrimination

    Employment discrimination claims under Title VII are analyzed under the

three-step burden-shifting framework set forth by the Supreme Court in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248 (1981).  Under the first step, plaintiff bears the initial burden of establishing a prima facie case of discrimination.  "The plaintiff must demonstrate that: (1) she fell within a protected class under Title VII; (2) she was qualified for the position she held; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 45 (2d Cir. 2015).

If the plaintiff succeeds in proffering sufficient evidence in support of the prima facie case, the burden of production shifts to the defendant to present evidence in support of a defense that "the adverse employment actions were taken for a legitimate, nondiscriminatory reason."  Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 129 (2d Cir. 2012) (citing Burdine).  Finally, should the defendant meet this burden, "the plaintiff then has the opportunity to demonstrate that the proffered reason" was merely pretextual.  Id. (citing Burdine).

### 2.    Retaliation

A retaliation claim under Title VII and NYSHRL is likewise evaluated pursuant to a modified version of McDonnell Douglas's three-step burden-shifting framework.  Hicks, 593 F.3d at 164.  To make out a prima facie case for retaliation, a plaintiff is required to demonstrate evidence of "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  Id. (internal citations and quotation marks omitted).

If plaintiff meets his initial burden, which is "de minimis," a presumption of retaliation arises.  Id.  The burden then shifts to defendant, who must then articulate a legitimate, non-retaliatory reason for the adverse employment action. Id.  If the defendant proffers evidence to rebut this presumption, the presumption dissipates; the plaintiff must then proffer evidence that the "employer was motivated by retaliatory animus." Id. at 164-65.  Retaliation need not be the "sole cause" of the adverse employment action for plaintiff to prevail.  Id.  However, it must be a "but-for" cause.  Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2525 (2013).

Thus, in order for a defendant to prevail on summary judgment for a Title VII claim of either discrimination or retaliation, he must prove either 1) that no reasonable juror could find that plaintiff has made out a prima facie case, or 2) no jury "could reasonably find an invidious discriminatory purpose" or another retaliatory purpose on the part of the employer.  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001); see also Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 252 (2d Cir. 2014).

III.    DISCUSSION

A.    Failure-to-promote

Plaintiff's failure-to-promote claim fails at the outset:  he fails to proffer the minimal evidence necessary to support a prima facie case.  To establish a prima facie failure-to-promote claim under McDonnell Douglas's first step, a plaintiff must proffer evidence that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was

16

rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." <u>Aulicino v. New York City Dep't of Homeless Servs.</u>, 580 F.3d 73, 80 (2d Cir. 2009) (internal citations omitted).  The fourth element may be satisfied alternatively by showing "circumstances giving rise to an inference of unlawful discrimination." <u>Quaratino v. Tiffany & Co.</u>, 71 F.3d 58, 64 (2d Cir. 1995); <u>see also</u> <u>Byrnie</u>, 243 F.3d at 103.

There is no question that plaintiff is a member of a protected class, or that he was never promoted.  However, he has not proffered any evidence to establish the second or fourth elements of the prima facie case: that he applied for and was qualified for the positions, and that the circumstances gave rise to an inference of discrimination.

### 1.   The "applied for" requirement

While the parties dispute the number of positions for which plaintiff applied, resolution of that dispute is unnecessary to the outcome of this motion.  The Court assumes, for the purposes of the motion, that he applied for all twelve positions.

### 2.   Plaintiff's qualifications

As to any of the twelve, however, plaintiff's factual proffer of qualification falls far short.  The DEP job postings for SWM, APM, Project Manager, and Civil Engineer positions clearly demonstrate that plaintiff lacked either the supervisory / program management experience or education credentials or both.  (Pigott Aff. Exs. 1-13.)

Indeed, plaintiff "concedes that several of the position he applied for he was not qualified to obtain," and only addresses the 2007 SWM and the 2009 Assistant

Dam Inspector positions.  (Pl.'s Br. at 9; see also Marchitelli Dep. (Downs Decl. Ex. P) Tr. 43:16-24 (noting that plaintiff did not have the minimum requirements of a college degree or project management experience for an APM position).)  For the 2009 Dam Inspector position, plaintiff concedes that he knew that he was not qualified for it because he lacked an engineering license.  (Compl. ¶ 28.)  And although plaintiff cites Ralph Marchitelli's testimony that he "met the basic requirements" for the 2007 SWM position, (see Marchitelli Dep. (Downs Decl. Ex. P) Tr. 44:6-8), Marchitelli's assertion contradicted by the fact that plaintiff plainly lacked the requirements listed in the job posting.[16]  (Pigott Aff. Ex. 3.)  As discussed above, plaintiff lacked the minimum supervisory experience, project management background, and educational credentials required by various SWM and APM / PM positions.  He also lacked the requisite engineering certifications required for the engineering positions.

    3.    Inference of discrimination

Even if plaintiff presented some evidence that he was qualified for any of the positions, his claim nevertheless fails because he proffers no evidence supporting an inference of discrimination, the fourth element of the failure-to-promote prima facie case.

One form of evidence supporting the inference is that the employer kept positions open for other applicants after plaintiff demonstrated his alleged

---

[16]    Plaintiff also cannot rely on Marchitelli's testimony to support his qualifications for this position, because Marchitelli also testified that plaintiff withdrew from the position.  (Marchitelli Dep. (Downs Decl. Ex. P) Tr. 44:8-45:4.)  Defendant also submitted contemporaneous documentary evidence in favor of this version of events that is not contradicted by any evidence from plaintiff. (Downs Decl. Exs. R, Q.)

qualifications.  See Aulicino , 580 F.3d at 80.  Plaintiff never makes such an allegation.

Another form of evidence supporting an inference of discrimination is that plaintiff had credentials "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001); see also Chenette v. Kenneth Cole Prods., Inc., 345 F. App'x 615, 619 (2d Cir. 2009) ("[A] plaintiff's "merely subjective assessment" of her own qualifications for promotion cannot defeat evidence that other individuals were more qualified . . . .").

There is no evidence in the record suggesting that plaintiff's qualifications were "so superior" to those of the individuals selected for the positions such that no reasonable person could have declined to select him.  See Byrnie, 243 F.3d at 103. Although plaintiff states that "upon information and belief" white applicants who were less qualified than him were promoted over him, (Compl. ¶¶ 21, 27-28), these assertions are not enough to stave off summary judgment because plaintiff has no personal knowledge of those applicants' qualifications.[17]  See Torrel v. City of New York, 114 F. App'x 14, 16 (2d Cir. 2004) (internal quotation marks and citations

---

[17]     This is also contradicted by DEP's presentation of affirmative evidence that plaintiff was less qualified than at least two of the candidates ultimately selected.  For the Associate Project Manager position in 2006, the candidate selected had a Master's of Science degree in computer engineering and a Bachelor of Engineering degree in electrical engineering.  (Def.'s 56.1 ¶ 112.)  For the SWSM position in 2007, the candidate selected had an Associate's Degree, had received specialized training in a number of areas, including emergency response and water chlorination, and had been serving as an Acting Supervisor at the time.  (Id. at ¶ 121.)  In contrast, although plaintiff has received a scholarship and has taken courses at community college towards a civil engineering degree, he never attained a post-secondary degree. While plaintiff's tenure at DEP was lengthy, it did not include any official supervisory roles, and he does not hold any certifications or licenses.

19

omitted).  Furthermore, since plaintiff did not even meet the posted qualifications

for the positions, DEP's decision not to select him was reasonable.  Byrnie, 243 F.3d

at 103 (holding that "no inference of discrimination can be drawn" when a hiring

decision "is reasonably attributable to an honest even though partially subjective

evaluation of [the candidates'] qualifications").

Thus, plaintiff has proffered no evidence giving rise to an inference of

discrimination.

## B.    Discriminatory Investigation Referral

In addition to his failure-to-promote claim, plaintiff also alleges that the

DOI's investigation of his jury service documentation was itself an act of

discrimination, based on discriminatory animus.[18]  To survive summary judgment,

---

[18]     Plaintiff also argues in opposition to summary judgment that his transfer to Kensico to work
in field maintenance also "constitutes an adverse employment action."  Plaintiff does not, however,
plead in his Complaint any facts regarding the Kensico transfer.  Parties cannot raise new claims for
the first time in summary judgment briefings and the Court may disregard them.  Avillan v.
Donahoe, 483 F. App'x 637, 639 (2d Cir. 2012); Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d
Cir. 1998).
         In any case, a claim on this basis would be unsuccessful on its merits.  Plaintiff has proffered
no evidence showing that the transfer was a "materially adverse change."  He does not contest that
in Operations at Shaft 18, he was required to "perform basic cleaning" on occasion.  (Pl.'s 56.1 at ¶ 9.)
Plaintiff has not alleged that his wages decreased, or that there was a material decrease in benefits,
or that field maintainer was a "less distinguished title" or would "constitute a setback to [his]
career."  Galabya v. N.Y.C.  Bd. of Educ., 202 F.3d 636, 640-41 (2d Cir. 2000).  That plaintiff's new
work included different tasks is simply not enough to constitute an adverse employment action.
         Furthermore, plaintiff has set forth no facts to raise an inference of discrimination with
respect to the transfer.  There is no evidence of discriminatory remarks, or of similarly situated non-
black or non-Jamaican individuals not given a transfer after a disciplinary investigation for theft of
time yielded an arrest.  (Def.'s 56.1 at 55.)
         Finally, DEP's proffered reason for the transfer is that "If there [are] issues that involve
integrity and a person is working in an area where they are required to sign off on regulatory
items . . . it has been the practice, even if there is . . . not a suspension . . . we will transfer people to
less sensitive assignments."  (Rush Dep. (Downs Decl. Ex. N.) Tr. 18:4-14; Def.'s 56.1 ¶¶ 58-61.)
Plaintiff's only counter to this argument is that DEP waited nearly a year after the jury notice issue
first came up to transfer him.  (Pl.'s 56.1 Response, 58-60.)  Yet DEP took action immediately after
DOI completed its investigation and referred plaintiff to the Westchester's DA's office.  Plaintiff's
observation does nothing to rebut defendant's proffered rationale.

plaintiff must support his argument that the investigation constituted an adverse employment action, and suggests some circumstance indicating discriminatory motivation.[19]  See Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 45 (2d Cir. 2015).  Plaintiff has failed to do either of these things.  But even if he had, his claim would nonetheless fail as defendant has proffered a non-discriminatory rationale for pursuing its investigation, and plaintiff has failed to address this in any way.  See Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 128-29 (2d Cir. 2012).

> 1.   Adverse employment action

An adverse employment action requires the employee to "endure a materially adverse change in the terms and conditions of employment."  Galabya v. N.Y.C.  Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotations omitted).  Plaintiff does not specify which action—DEP's referral of his jury service issue to its internal DOI division, or DOI's referral of his case to the Westchester DA—was allegedly discriminatory.[20]  In all events, neither constituted an "adverse employment action" because there is no record evidence that the actions affected the "terms and conditions" of his employment.  See Galabya, 202 F.3d at 640.

An employer's investigation into alleged misconduct does not, without more, constitute an adverse employment action.  See Cox v. Onondaga Cnty. Sheriff's Dept., 760 F.3d 139 (2d Cir. 2014); Tepperwien v. Entergy Nuclear Operations, Inc.,

---

[19]   There is no dispute as to the first two elements of the prima facie case: that plaintiff is a member of a protected class and was qualified for his current position.

[20]   Because plaintiff's arrest was authorized by the DA, not defendant, we do not consider it as a separate basis for the discrimination claim against defendant.  (Def.'s 56.1 ¶ 39.)

663 F.3d 556, 568-70 (2d Cir. 2011).  The initiation and referral of investigations cannot be in themselves adverse employment actions because "if the charges were ultimately dismissed," then plaintiff "would not have suffered any adverse [employment] effect from them."  Yerdon v. Henry, 91 F.3d 370, 378 (2d Cir. 1996); see also Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner.").  In this instance, plaintiff does not dispute that Compito, his direct supervisor, gave him an opportunity to correct the leave slip before the DOI referral.  (Def.'s 56.1 ¶ 21.)  If plaintiff had opted to do so, it is possible that no investigation would have occurred at all.

Furthermore, referral to a district attorney's office, unless "unfounded," does not by itself constitute an adverse employment action.  Boylan v. Arruda, 42 F. Supp. 2d 352, 357 (S.D.N.Y. 1999).[21]  It is undisputed that the DOI investigator "had not yet formed an opinion" on the facts of plaintiff's case after he received the referral from DEP.  (Def.'s 56.1 ¶ 35.)  Plaintiff also does not present any evidence challenging the reasonableness of DOI's investigation, besides pointing to notes from a July 2009 interview with the Connecticut Superior Court Clerk conducted by DOI.  (Pl.'s 56.1 ¶ 47; Rose Aff. Ex. 13.)  However, the notes are not evidence that DEP's decision to refer plaintiff to DOI was unreasonable because it was the DOI

---

[21]     In fact, courts in this circuit and others have also held that even placing an employee on administrative leave without pay during the pendency of the investigation does not constitute adverse employment action; in this case, plaintiff continued working during the investigation.  See Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006).

investigation that yielded that note in the first place.  In other words, plaintiff

cannot simultaneously allege that it was unfounded for DEP to refer his case to DOI

for an investigation, and use evidence collected through the investigation to

demonstrate that the case should not have been referred.

The notes are also not evidence of DOI's acting unreasonably.  It merely

states that the clerk's signature on the certification slip was genuine, and does not

address the fact that it bore incorrect dates for plaintiff's jury service.  (Rose Aff. Ex.

13.)  Moreover, DOI was not under any obligation to interpret the evidence in front

of it in a light favorable to plaintiff.  "The presumption of innocence applies to

criminal trials . . . and is not a requirement that Title VII imposes on employers."

Joseph, 465 F.3d at 91.

Because plaintiff has not proffered evidence that could lead a reasonable

juror to conclude that the referral to DOI or to the DA was unfounded, he cannot

establish the second prong of a prima facie case for employment discrimination—

that the referral constituted an adverse employment action.

### 2.    Inference of discrimination

Plaintiff also has failed to proffer evidence suggesting that defendant's

actions give rise to an inference of discrimination, the fourth element of his prima

facie case.  Plaintiff has provided no admissible evidence of racial animus, or

evidence that similarly situated non-black or non-Jamaican individuals were

treated differently.  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d

Cir. 1997) ("To establish the fourth element of a prima facie case, [a plaintiff] must

show that she was treated differently from "similarly situated" [individuals].").

23

First, plaintiff provides no evidence that anyone at DEP was motivated by plaintiff's race or nationality.  He, for instance, provides no evidence of any racially-based comments.  See Aulicino, 580 F.3d at 82.  He proffers no evidence that his supervisors ever referred to his race during the investigation.  As to the DOI, there is no evidence that anyone there knew plaintiff's race or national origin when the investigation began.

Barquet's testimony—that he had a "gut feeling" that plaintiff was being discriminated against—does not support a triable issue of discriminatory intent.  Such testimony is not admissible; it is speculation.  Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) ("Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." (internal quotation marks and citation omitted)).  When asked to support his "gut feeling," Barquet could not point to any instances of discriminatory acts. (Barquet Dep. Tr. 29:25-30:10; 47:11-15; 48:11-19; 49:9-12.)

In addition, Barquet's retelling of Chief of Eastern Operations Mark Donecker's statement that plaintiff suffered discrimination is also inadmissible as speculative as well as hearsay.  (Id. at Tr. 59:7-60:15 ("I called Mark Donecker . . . [who said] and remember, they discriminated against him . . . it caught me off base, and I said they did [?], and he said yeah, well, and I left it at that . . . . It doesn't mean that he [Donecker] was the one that discriminated, just means that he kind of said somebody else discriminated against him").)

24

Plaintiff has also provided no admissible evidence that similarly situated non-black or non-Jamaican individuals were treated differently in forgery investigations.  See Shumway, 118 F.3d at 64.  "To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare [him]self must be similarly situated in all material respects."  Id.  In misconduct scenarios, plaintiff's "similarly situated" comparators are those who engaged in the same type of alleged misconduct.  See Shumway, 118 F.3d at 64; see also Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) (applying Shumway to racial discrimination scenario).  There must be evidence of "a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001); see also Barriera v. Bankers Trust, No. 98 Civ. 3641 (MBM), 2003 WL 22387099, at *1, *6 (S.D.N.Y. Oct. 20, 2003) (holding that "unequal enforcement of [an employer's] policy cannot give rise to an inference of race discrimination absent some evidence that plaintiff was targeted because of her race").

Plaintiff offers two lists of employees to support his case:  (1) four other employees who were referred for criminal prosecution for falsifying documents— three of whom plaintiff alleges were non-white, and (2) three allegedly white employees who were not referred for criminal prosecution despite allegations of falsifying documents.  (Pl.'s 56.1 ¶¶ 64, 65, 67.)  These lists are not admissible as a threshold matter because there is no record evidence as to the racial background of

these employees, only the assertion of plaintiff without foundation.  (Pl.'s 56.1 ¶¶ 64-65; Rose Aff. Exs. 32-40.)

Moreover, even assuming that plaintiff had admissible evidence to support the race data, the lists do not support even a "minimal inference" that any difference between dispositions is due to plaintiff's race.  The first list of three allegedly non-white employees and one white employee referred to criminal prosecution do not help plaintiff's case at all—by definition, it does nothing to suggest that white workers "similarly situated" to plaintiff were treated differently.[22]  Graham, 230 F.3d at 40.

The second list also does not contain "similarly situated" individuals for comparison.  Of these three allegedly white employees plaintiff claims were better-treated than he was because they were not referred to DOI "despite actually having forged documents to get compensated for time off," two did not even contest the charges of misconduct when DEP confronted them.  This of course obviates the need for further investigation.  A third had a disciplinary record containing only a one-sentence description, which is insufficient for drawing any comparison.  (Rose Aff. Exs. 35, 36, 39.)  Plaintiff, on the other hand, continued to contest the charge until

---

[22]     To the extent that plaintiff argues that DEP engaged in a pattern or practice of referring non-white employees for prosecution, he would have to present evidence of "gross statistical disparities" which "cannot be explained except on the basis of intentional discrimination."  Burgis v. New York City Dep't of Sanitation, 798 F.3d 63, 69 (2d Cir. 2015) (citing Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307–08 (1977)), petition for cert. filed (U.S. Dec. 14, 2015) (No. 15-825). For plaintiff to prevail, the data "must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely."  Burgis, 798 F.3d at 69.  Plaintiff has not presented any such evidence on investigation referrals.  (See Pl.'s 56.1 ¶ 66; Rose Aff. Ex. 32, 33).

over a year after he was arrested—nearly two years after the investigation at DEP began.

Another important difference between plaintiff and these three individuals is the nature of the offenses.  Plaintiff was investigated for theft of time—specifically, falsifying a record in order to obtain personal pecuniary gain.  On the other hand, one of the allegedly white employees was accused of forging his supervisor's signature on an authorization for hazardous waste pickup.  (Rose Aff. Ex. 35.)  Another was accused of "deliberately enter[ing] fake readings on the Blower log."  (Rose Aff Ex. 36.)  There are no indications that these falsifications were made in order to obtain pecuniary gain; these individuals are therefore not similarly situated to plaintiff in this material respect.  See Shumway, 118 F.3d at 64.  Only one allegedly white employee was accused of theft of time.  (Rose Aff. Ex. 39.)  This is, of course, not enough to support an inference that similarly situated non-minority and non-Jamaican individuals were treated differently from plaintiff.

3.   Nondiscriminatory rationale

Finally, even if plaintiff can establish a prima facie case of discrimination, defendant has offered a legitimate, non-discriminatory reason for its decision: that it was following protocol.  Defendant claims that it responded to evidence that plaintiff forged his jury service certification by pursuing an investigation before taking any action against plaintiff.  Plaintiff offers no evidence to counter this.  In fact, his citation to the deposition of DEP's in-house disciplinary counsel supports defendant's position.  (See Lowenheim Dep. (Rose Aff. Ex. 12) Tr. 33:10-19 ("I do know that asking for pay for a day that you are not entitled to be paid is considered

27

theft, and DOI is supposed to investigate things regarding employees or contractors of the City that are criminal and that falls in that category.").)

Furthermore, there is no record evidence that DOI's referral of plaintiff's case to the Westchester DA is anything but the result of standard protocol. In fact, plaintiff concedes that DOI has no choice but to refer a case to the DA if it finds probable cause, which defendant states existed in this case. (Def.'s 56.1 ¶¶ 33-34.) Moreover, plaintiff's guilty plea is at least partially probative of the fact that the referral to DOI was not unfounded and validates DEP's legitimate, nondiscriminatory reason for its actions.

Because plaintiff does not provide admissible evidentiary support to rebut defendant's production of a nondiscriminatory reason for referring him to DOI and to the Westchester DA, no reasonable juror could find that plaintiff has met his burden in rebutting the defendant's position.

C.    Retaliation

Plaintiff alleges that his December 2007 meeting with Donecker and Marchitelli, where plaintiff's union representative Dave Catala alleged on plaintiff's behalf that DEP's failure to promote plaintiff was discriminatory, was the impetus behind two retaliatory acts: (1) offering and then denying him a job as an assistant dam inspector, and (2) investigating him for an error in his jury service leave slip. (Pl.'s 56.1 ¶¶ 17-18.)[23]

---

[23]    Although plaintiff states in his Rule 56.1 Counterstatement that he received a negative performance review after the 2007 meeting (Pl.'s 56.1 ¶ 32), this claim was not alleged in plaintiff's Complaint, and plaintiff offered no evidence of the evaluation itself—only his letter challenging it.

To survive summary judgment on a retaliation claim, plaintiff must present evidence for a prima facie case, and to rebut any non-retaliatory rationales offered by defendant by presenting evidence that the "employer was motivated by retaliatory animus."  Hicks v. Baines, 593 F.3d 159, 164-65 (2d Cir. 2010).

A prima facie retaliation claim requires evidence of "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  Hicks, 593 F.3d at 164 (internal citations and quotation marks omitted).  Although there is dispute as to what exactly happened at the 2007 meeting, plaintiff has proffered a sufficient evidentiary basis to establish that the first prong of the prima facie case for retaliation was met for summary judgment purposes.  Interpreting the proffered facts in a light most favorable to plaintiff, plaintiff was participating in a protected activity when he made a discrimination complaint in the 2007 meeting through Catala.  (Def.'s 56.1 ¶ 155; Pl's 56.1 Resp. ¶ 157; Pl.'s 56.1 ¶ 20.)  Later—or even immediate—withdrawal of that complaint is irrelevant because retaliation can occur once a grievance is made, regardless of whatever follows.

We now turn to the other elements of the prima facie cases for the two charges of retaliation.

### 1.   The DOI investigation

Plaintiff claims that DEP's decision to refer his case to the DOI and the DOI's decision to refer his case to the Westchester DA were decisions in retaliation for the 2007 meeting.

First, with regard to the DOI's decision to refer plaintiff's case to the Westchester DA, there is no record evidence indicating that DOI personnel had any knowledge of plaintiff's 2007 meeting or any complaints plaintiff may have lodged regarding discrimination. Thus, plaintiff fails to meet the second prong of the prima facie retaliation case for the claim that DOI retaliated against him by referring his case to the DA.

Second, plaintiff cannot survive summary judgment because he has not proffered any facts in support of causation.[24] Plaintiff must proffer evidence in support of but-for causation (that is, "that the harm"—in this case, criminal investigation and arrest—"would not have occurred in the absence of—that is, but for—the defendant's [retaliation]."). Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2525 (2013). Plaintiff fail to offer any evidence linking the 2007 meeting and the 2008 referral to DOI. Indeed, plaintiff presents no evidence indicating that DEP would have ignored the discrepancy in plaintiff's leave slip if he had only not lodged a discrimination grievance in 2007. Furthermore, the fact that plaintiff was given an opportunity to correct the inaccurate leave slip, but declined to do so, is evidence that DEP referred his action to DOI because of suspected falsification, not because of the 2007 meeting. (Def.'s 56.1 ¶ 21.)

---

[24] Plaintiff presents sufficient evidence on the third prong of the prima facie case for retaliation, as "adverse employment action" is read more broadly for a retaliation claim than for a discrimination claim. Burlington Northern, 548 U.S. 53, 63-64 (2006). In the anti-retaliation context, an action does not need to be directly related to employment in order to be an "adverse employment action." Id. Instead, an action by an employer that might "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" qualifies as an adverse employment action. Id. at 54. A reasonable juror may find that a reasonable employee would be dissuaded from lodging a discrimination claim if he knew that the employer would retaliate by launching an investigation into a relatively minor offense—even the suspicion of wrongdoing was not unfounded.

Plaintiff does proffer evidence that another black employee who had complained of discrimination was subject to criminal prosecution for falsifying PH readings.  (Pl.'s 56.1 ¶ 64b.)  Even if this evidence were admissible, pointing to one example of one other employee who experienced similar treatment is not evidence of a causal link.

Finally, plaintiff's argument that an inference of causation can be drawn because the DOI referral was the first opportunity to retaliate fails for several reasons.[25]  First, this assertion is belied by plaintiff's own claim that Donecker immediately retaliated against him by offering him a position that could not come to fruition.  Second, plaintiff must sufficiently allege a causal connection on the basis that it is "plausible that [defendant] would have waited to exact their retaliation" until plaintiff had committed a criminal act.  Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009).  There is simply no such evidence in the record to support a "plausible" inference that defendant laid in wait for plaintiff to err.  Therefore, plaintiff has failed to proffer evidence supporting a causal nexus between the 2007 meeting and the 2008 referral for investigation.

---

[25]     This Court does not derive its causation opinion from the length of time (eight months) that elapsed between the meeting and the DOI referral.  Plaintiff can indirectly establish causation by "showing that the protected activity was closely followed in time by the adverse action," Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (emphasis added), the "temporal proximity must be very close."  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).  However, this Circuit sets no bright-line limit on how much time can pass between a protected activity and the adverse employment action.  Compare Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (holding that three months was insufficient to draw inference), with Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (holding that a period of eight months could lead to an inference of causation).

Furthermore, defendant's proffers of non-retaliatory reasons for the referral—the same as the rationales provided as to the discrimination claim on the investigation, described inter alia above—stand unrebutted by plaintiff.  Because plaintiff has failed its burden at either stage, it cannot prevail on summary judgment on the retaliation claim regarding the investigation.

## 2.   The 2009 Dam Engineer position

Plaintiff also asserts that defendant retaliated against him by promising plaintiff an assistant dam inspector position during the December 2007 meeting.  Plaintiff's claim is rooted upon the premise that Donecker made a false, impossible promise in the meeting in an effort to placate him after Catala alleged DEP was discriminating against plaintiff by passing him over for promotions.  Furthermore, plaintiff alleges that defendant gave plaintiff the impression that he was applying for the assistant dam inspector position when in reality he was applying for a dam engineer position for which he did not qualify.

It is undisputed that at the meeting, Donecker assuaged plaintiff's concerns by discussing the possibility of a future position.  However, the parties disagree as to whether Donecker promised that plaintiff would get a promotion, or merely that he would be considered for one.  Construing the evidence in the light most favorable to plaintiff, we assume that Donecker promised that plaintiff would receive the dam safety inspector position.

The threshold question for the prima facie retaliation case, then, is whether Donecker's promise was an adverse employment action.  Even though the adverse employment action requirement under the retaliation standard is looser than under

32

the antidiscrimination standard, plaintiff cannot prevail in this instance.  The retaliatory activity here need not affect the terms and conditions of employment, but it still must be sufficiently serious: it must "dissuade[] a reasonable worker [or applicant] from making or supporting a charge of discrimination."  Burlington Northern, 548 U.S. 53, 68 (2006) (internal quotation omitted).  Plaintiff has proffered no evidence that Donecker's promise would dissuade a reasonable worker from airing a discrimination grievance.  While an employee may not want his manager to make false promises, Title VII does not protect an employee from "all retaliation," only "retaliation that produces an injury or harm."  Id. at 67.  Allegations that a supervisor attempted to placate a plaintiff with the promise of a better job are simply insufficient to establish injury under Title VII.

Plaintiff has also set forth no evidence suggesting that he was qualified for either the dam safety engineer or inspector job.  In addition, it is undisputed that the dam engineer position required an engineering degree or license that plaintiff did not have.  (Def.'s 56.1 ¶ 171.)

In short, Donecker's misrepresentation is insufficient to constitute an adverse employment event for the purposes of Title VII retaliation, and plaintiff falls short of a prima facie case for retaliation.

### D.   Exhaustion of Administrative Remedies under Title VII

While Title VII requires that a plaintiff exhaust administrative remedies before bringing a lawsuit, 42 U.S.C. 2000e-5(e)-(f); Fowlkes v. Ironworkers Local 40, No. 12-336-cv, 2015 WL 3796386, at *1, *4 (2d Cir. Sept. 24, 2014), this requirement

is "merely a precondition to suit" and not a jurisdictional bar.  Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000).

The allegations set forth in plaintiff's EEOC charge are much narrower in scope than his complaint in this action; notably, the charge details only his failure-to-promote claims and does not include any reference to his referral to DOI. However, because defendant did not raise this issue—and, consequently, plaintiff did not have the opportunity to brief equitable defenses and "reasonable relatedness"—the Court does not bar plaintiff's claims on the basis of failure to exhaust.  See Fowlkes at *7; Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003) (setting forth the requirements for a "reasonable relatedness" exception).

IV.    CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is GRANTED.  The Clerk of Court is directed to close the motion at ECF No. 64 and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            January 27, 2016


_____
        KATHERINE B. FORREST
        United States District Judge

34